LARAMIE RIVER CONSERVATION COUNCIL and Powder River Basin Resource Council, Appellants (Petitioners below),

v.

INDUSTRIAL SITING COUNCIL of the State of Wyoming and Basin Electric Power Cooperative, Appellees (Respondents below).

No. 4795.

Supreme Court of Wyoming.

Dec. 29, 1978.

Lawrence A. Yonkee and David F. Palmerlee, of Redle, Yonkee & Arney, Sheridan, for appellants.

D. N. Sherard and Richard A. Stacy, Wheatland, for appellee, Basin Elec. Power Co-op.

V. Frank Mendicino, Atty. Gen., Steven F. Freudenthal, Asst. Atty. Gen., and Marilyn S. Kite, Senior Asst. Atty. Gen., Cheyenne, for appellee, Industrial Siting Council of the State of Wyoming.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

THOMAS, Justice.

What is the nature and scope of the proceedings that must be conducted by the Industrial Siting Council, pursuant to the Industrial Siting Act,[1] prior to granting a permit for the construction and operation of a coal-fired steam electric generating plant? The resolution of this major question requires an examination of the statutory procedures to be followed by the Industrial Siting Council before such a permit is granted, including those circumstances which may require the Industrial Siting Council to reject a permit application and order a further intensive study and evaluation of the proposed facility. As adjuncts to this major question the appeal presents questions relating to the burden of proof imposed upon an applicant for an industrial siting permit, and the proper standards for judicial review in such an instance. Further questions as to the sufficiency of the evidence with respect to several of the factors involved in the Laramie River Station

1. Section 35–12–101 through § 35–12–121, W.S.1977; Chapter 169, S.L. of Wyoming, 1975, as amended by Chapter 66, S.L. of Wyoming, 1977. Previously codified as § 35–502.75 through § 35–502.94, W.S.1957, 1975 Cum. Supp.

project, the effect of imposing conditions in the permit without intensive study and evaluation, and whether a transcript of a decisional public meeting must be included in the administrative record also are presented.

Laramie River Conservation Council and Powder River Basin Resource Council appeal an order of the District Court of the First Judicial District of the State of Wyoming in and for Laramie County, affirming the order of the Industrial Siting Council, entered on April 29, 1976, in Docket No. WISA–75–3, granting Industrial Siting Permit ISC–00–02–76 to Basin Electric Power Cooperative to construct the facility described in the application pursuant to § 35–502.82(e)(iii), W.S.1957, as amended (now § 35–12–109(e)(iii), W.S.1977), subject to certain conditions set forth therein. The application was for the construction of a steam electric generating facility and associated transmission facilities identified as the Laramie River Station. It therein is described as consisting of three coal-fired steam-electric generating units, each unit having a capacity of 500 megawatts (net) with certain appurtenant facilities. The anticipated total cost of the Laramie River Station and its appurtenant facilities was approximately $975,927,758 (in 1975 dollars) of which approximately $62,818,800 would be expended on facilities outside the State of Wyoming. The application encompasses the following facts. The site of the power plant is in Platte County on the south bank of the Laramie River approximately five miles north and east of the town of Wheatland, Wyoming. Coal for the operation of the Laramie River Station will be obtained from mining operations in the Powder River Basin, and delivery of the coal will be made by rail on the Colorado and Southern Railroad. Water for the operation of the generating station and cooling will be delivered from a pumping structure located at Gray Rocks Dam. Gray Rocks Dam and its associated reservoir are to be located on the lower Laramie River with a storage capacity of approximately 104,000 acre feet, and it will serve as a water storage facility for the station. The electricity from the generating station will be sold in interstate markets. The participants in this project are Wyoming Municipal Electric Joint Powers Board, Tri-State Generation and Transmission Association, Inc., Basin Electric Power Cooperative, Missouri Basin Public Power Financing Corporation, and Heartland Consumers Power District.[2]

The construction period for the Laramie River Station would require in the year 1976–520 men; 1977–750 men; 1978–1,780 men; 1979–2,000 men; 1980–1,210 men;

2. The members of the Wyoming Municipal Electric Joint Powers Board are the City of Cody and the Towns of Fort Laramie, Guernsey, Lingle, Lusk, Pine Bluffs, Torrington, Wheatland, and Gillette (Gillette having no vote as an associate member). Tri-State Generation and Transmission Association, Inc., is a non-profit corporation which furnishes electric power and energy within Wyoming, Colorado and Nebraska. There are eleven Wyoming members of Tri-State which are Big Horn Rural Electric Company, Basin, Wyoming; Carbon Power and Light, Inc., Saratoga, Wyoming; Garland Light and Power Company, Powell, Wyoming; Hot Springs County Rural Electric Association, Inc., Thermopolis, Wyoming; Niobrara Electric Association, Inc., Lusk, Wyoming; Riverton Valley Electric Association, Inc., Riverton, Wyoming; Rural Electric Company, Inc., Pine Bluffs, Wyoming; Sheridan-Johnson Rural Electrification Association, Sheridan, Wyoming; Shoshoni River Power, Inc., Cody, Wyoming; and Wyrulec Company, Lingle, Wyoming. Through Basin Electric Power Cooperative, Tri-County Electric Association, Inc., located at Sundance, Wyoming, purchases electric power and energy. Basin Electric Power Cooperative also sells electric power and energy at wholesale to members within the states of North Dakota, South Dakota, Nebraska, Montana, Minnesota, Iowa and Colorado. The Missouri Basin Public Power Financing Corporation is engaged in the acquisition of future supplies of bulk power for its members in the states of Iowa, Minnesota and South Dakota, and Lincoln Electric Planning Systems Corporation contemplates being the financing vehicle for the City of Lincoln, Nebraska Electric System which is engaged in the sale of electric power and energy at retail to customers within the municipal boundaries of the City of Lincoln. Heartland Consumer Powers District is engaged in the acquisition of future supplies of bulk power for entities and persons within the boundaries of that district, and it does not propose to sell power or energy within the State of Wyoming.

1981–630 men; 1982–840 men; 1983–560 men. The permanent employees for the operation of the Laramie River Station would increase slowly to the required number of 200 men by the time of completion of the construction of the third unit.

There is no question that the construction of the Laramie River Station will have a substantial effect on Platte County and the community of Wheatland, and perhaps Goshen and Laramie Counties. Because of the significance of this project we have made an intensive evaluation of the law and the pertinent record facts. Finding no error of law and further finding that the record is sufficient to support the factual determinations by the Industrial Siting Council, we shall affirm the order of the district court.

The procedure which the Industrial Siting Council must pursue is invoked by the filing of an application for a permit at the state office of the Industrial Siting Council Administration. While required to be in the form prescribed by the Rules and Regulations of the Industrial Siting Council, the application must contain information about the applicant and the proposed facility in at least 15 areas prescribed by the statute. Section 35–502.81, W.S.1957, as amended (now § 35–12–108, W.S.1977). The applicant may also furnish whatever other information it considers to be relevant, and must furnish other information which may be required by rule or regulation. Between the 20th and 30th days after receipt of the application, notice of the application must be served upon the governing bodies of local governments which will be affected by the proposed facility; a summary of the application is to be published in one of the newspapers of general circulation within the area; and a copy of the application is to be filed with the county clerk where the

facility is to be located. Section 35–502.82(a), W.S.1957, as amended (now § 35–12–109(a), W.S.1977). Between the 40th and 60th days after receipt of the application a hearing must be scheduled and conducted at a community as close as practicable to the proposed facility, and the hearing must have been preceded by notice of the hearing from the director to the applicants and the local governments together with a publication of a notice of the hearing in a newspaper of general circulation within the affected area. Section 35–502.82(b), W.S.1957, as amended (now § 35–12–109(b), W.S.1977, which expanded the time frame so that it now is between the 90th and the 120th days).

At the hearing the burden of proof is upon the applicant to demonstrate its entitlement to the permit, and the Council shall hear and receive evidence presented by any other state department or agency relative to the environmental, social and economic conditions and projected changes therein. Section 35–502.82(c) and (d), W.S. 1957, as amended (now § 35–12–109(c) and (d), W.S.1977).[3] The Council shall make its initial determination within 60 days after the public hearing, and according to statute is to adopt one of the following results:

"(i) Approving the application and issuing a permit with no conditions.

"(ii) Approving the application and issuing a permit conditioned upon commencing the construction at a reasonable time specified by the council;

"(iii) Approving the application and issuing a permit conditioned upon specified changes in the application; or

"(iv) Rejecting the application pending further study as required by the council if the applicant is not able to demonstrate to the council that the requirements of

3. With respect to the applicant's burden the statute provides as follows:

"(c) The applicant may present such evidence as necessary to demonstrate to the council:
"(i) That the proposed facility comply [sic] with all applicable law;
"(ii) That the facility will not pose a threat of serious injury to the environment nor to the

social and economic condition of inhabitants or expected inhabitants in the affected area; and
"(iii) That the facility will not substantially impair the health, safety or welfare of the inhabitants." Section 35–502.82, W.S.1957, as amended (now § 35–12–109, W.S.1977).

subsection (c) of this section have been met." Section 35–502.82(e), W.S.1957, as amended (now § 35–12–109(e), W.S.1977). The Council must make its initial determination within 60 days at which time it is required to enter its order.

The contested case procedures of the Wyoming Administrative Procedure Act[4] specifically apply to this hearing. Section 35–502.86, W.S.1957, as amended (now § 35–12–113, W.S.1977). The statute specifically provides that " * * * any nonprofit organization with a Wyoming chapter, concerned in whole or in part to promote conservation or natural beauty, to protect the environment, personal health or other biological values, to preserve historical sites, to promote consumer interests, to represent commercial and industrial groups, or to promote the orderly development of the areas in which the facility is to be located, * * " is to be considered a party to a permit proceeding, and this description would include organizations such as the appellants here. Section 35–502.85(a)(iii), W.S.1957, as amended (now § 35–12–112(a)(iii), W.S. 1977). Pursuant to § 35–502.88, W.S.1957, as amended (now § 35–12–115, W.S.1977) any party aggrieved by the final decision of the Industrial Siting Council may obtain judicial review which is specifically stated to "be the same as that for contested cases under the Wyoming Administrative Procedure Act."

If the Council pursues the fourth statutory alternative by rejecting the application pending further study because the applicant is not able to demonstrate to the Council that the requirements of subsection 35–502.82(c), W.S.1957, as amended, have been met, the statute then provides a procedure for intensive investigation, study and evaluation of the proposed facility and its effects as specified in the preliminary decision. Sections 35–502.83 through 35–502.85, W.S. 1957, as amended (now § 35–12–110 through 35–12–112, W.S.1977). This part of the statute sets forth a list of some eight topics which may be designated as necessary for further study, after which study the Council shall make complete findings, issue an opinion and render a decision upon the record, either granting or denying the application as filed or granting it upon such conditions or modifications of the construction, operation or maintenance of the facility as the Council may determine appropriate. Section 35–502.87, W.S.1957, as amended (now § 35–12–114, W.S.1977).

Following a decision entered after this more intensive study the same right of judicial review is available. The statute is silent as to any criteria which would automatically invoke the more intensive study other than the action of the board following the initial hearing. The statute then goes on in other provisions to provide for revocation or suspension of a permit for cause, monitoring of facilities for assurance of compliance with the statutory requirements, and penalties for a violation of the act. Sections 35–502.90 through 35–502.92, W.S.1957, as amended (now § 35–12–117 through § 35–12–119, W.S.1977).

In affirming the district court we deal with and dispose of the following questions:

1. What was the intention of the legislature with respect to the nature of the proceedings that the Industrial Siting Council must conduct prior to the granting of a permit for the construction and operation of an industrial facility within the State of Wyoming? In this connection we are asked to decide what circumstances require the Industrial Siting Council initially to reject a permit application and order the further intensive study and evaluation of the proposed facility. The appellants argue that the proper construction of the statute is that if it is a major facility such an intensive study and evaluation is contemplated in every instance.

2. Whether provisions of the Industrial Information and Siting Act establish a burden of proof to be met by an applicant for a permit which is more demanding than the preponderance of the evidence test formulated in relation to the Wyoming Administrative Procedure Act.

---

**4.** Section 9–276.19, et seq., W.S.1957, as amended (now § 9–4–101, et seq., W.S.1977).

3. Whether there is a special standard for judicial review under the Industrial Information and Siting Act or does the statute invoke the ordinary standards of review under the Wyoming Administrative Procedure Act.

4. Whether conditions for a permit must be the product only of the intensive study and evaluation of the proposed facility or whether a permit subject to conditions can be issued without such a study and evaluation, and if so, how are those conditions to be determined.

5. Whether the Industrial Siting Council can approve the application in part, that is, the construction of the generating plant, without also approving the transmission lines needed to distribute the electricity generated at the plant.

6. Whether the transcript of a decisional meeting of the Industrial Siting Council is an essential part of and must be included in the administrative record to be reviewed by the judicial branch of government.

7. Whether the findings and conclusions of the Industrial Siting Council with respect to the economic condition improperly ignore the circumstances of the agricultural industry in the area, and whether the evidence is sufficient to sustain the findings and conclusions of the Council with respect to the social conditions in the area, health, safety and welfare in the area, and the location of the transmission lines.

It is appropriate to consider together the appellants' first three contentions relating to the burden of proof, the substantial evidence rule, and the intent of the legislature in adopting the Industrial Siting Act. As set forth in their brief these read as follows:

"*BURDEN OF PROOF*

"The use of the phrase 'pose a threat' in the Siting Act raises the burden of proof above the normal 'preponderance of the evidence' test. Under the 'preponderance of the evidence' rule, a finding of no serious injury leaves open the reasonable possibility of serious injury. To eliminate that reasonable possibility of serious injury, the Siting Act raises the burden of proof, *at the initial hearing,* and requires the applicant to demonstrate that there is no reasonable possibility of serious injury by requiring the applicant to demonstrate that the facility does not pose a threat of serious injury.

"*SUBSTANTIAL EVIDENCE RULE*

"The basic characteristic of the 'substantial evidence' rule is that the agency finding under review must be *reasonably* supported by the evidence and the reviewing Court must consider the entire record, not just the evidence favorable to the agency decision. This coupled with the elevated burden of proof at the first stage results in the following standard of review: Does the evidence take in its entirety reasonably support the conclusion that all reasonable possibilities of serious injury have been eliminated.

"*SITING ACT INTENT*

"The Siting Act provided the State of Wyoming with a mechanism to fully evaluate a proposed facility to determine what effect the facility might have on the quality of life in Wyoming, and to determine if that effect would be acceptable. It is the intent of the Siting Act to cause the State to conduct comprehensive study and evaluation of major industrial facilities, while leaving open the possibility that relatively small, low impact facilities could be permitted without the extensive study process. This is implemented by the two stage process, the second stage being waived if there is no possibility of serious injury from the proposed facility. The length and complexity of the application materials coupled with as little as ten (10) days from notice of the application proceeding to date of hearing compel denial for further study, as a matter of law, an application for a facility of the size, magnitude and impact of the Laramie River Station."

In making these arguments the appellants conclude that the utilization of the phrase, "pose a threat" in the Industrial Development Siting Act, § 35–502.82(c)(ii),

W.S.1957, as amended (now § 35–12–109(c)(ii), W.S.1977), has the effect of creating a burden of proof on the part of an applicant sufficient to require it to demonstrate at the initial hearing that there is *no reasonable possibility of serious injury to the environment nor to the social and economic condition of the inhabitants as a result of the facility, and further that there is no reasonable possibility that it will substantially impair the health, safety or welfare of the inhabitants.*

The appellants then argue that a coupling of such a burden of proof with the substantial evidence rule, requiring a consideration of the entire record, and that the finding of the Industrial Siting Council be supported by all of the evidence, has the effect of creating a special standard of review. Under the appellants' suggested standard of review the evidence taken in its entirety must support the conclusion that all reasonable possibilities of serious injury have been eliminated.

While the contentions of the appellants with respect to the burden of proof and the substantial evidence rule are intriguing, we decline to adopt the standards which they have suggested in their brief. On September 9, 1975, the Rules and Regulations of the Industrial Siting Council of the State of Wyoming were adopted. Included therein, with some supplemental definitions were §§ 6b and 6c. They provide in pertinent part as follows:

"Section 6. *Initial Determination.*

* * *

"b. Threat of serious injury. In order to demonstrate that the facility does not pose a threat of serious injury, the applicant must demonstrate that the granting of a permit will not result in a significant detriment to, or impairment of, the environment or the social and economic condition of present or expected inhabitants.

* * * * * *

"(2) 'Social condition' shall include, but is not limited to, the following factors:
"(a) Water treatment;
"(b) Sanitary waste disposal;
"(c) Solid waste collection;
"(d) Housing;
"(e) Police and fire protection;
"(f) Medical facilities;
"(g) Schools;
"(h) Recreational facilities;
"(i) Transportation systems;
"(j) Mental health facilities,
"(k) Social service facilities.
"In determining whether the proposed facility poses a threat of serious injury to the social condition of the inhabitants, any significant decrease in the quality or quantity of the preceding services or facilities may be considered a serious injury.
"(3) 'Economic conditions' shall include, but is not limited to, the following factors:
"(a) Upgrading of jobs and increased income;
"(b) Family and per capita income;
"(c) Unemployment and underemployment rates within the area of site influence;
"(d) Purchasing power of earnings within the area of site influence;
"(e) Short-term and long-term fluctuations in resource consumption and resource availability;
"(f) Employment dislocation and skill obsolescence;
"(g) Employment opportunities;
"(h) Diversity of economy and stability of various sequents of the economy;
"(i) Increased diversity of the economy.
"In determining whether the proposed facility poses a threat of serious injury to the economic condition of the present or expected inhabitants, any net deterioration of a material nature in the condition of either present or expected inhabitants with respect to the above factors will be weighed negatively.
"c. Substantially impair the health, safety or welfare of the inhabitants. The applicant must demonstrate to the Council that the proposed facility will not substantially impair the health,

safety or welfare of the present or expected inhabitants of the areas of site influence. For purposes of this subsection, the following definitions control:

"(1) Definitions.

"(a) 'Health' shall mean the state of being sound in body or mind and includes psychological as well as physical well-being.

"(b) 'Safety' shall mean freedom from fear of injury or threat of injury. Such injury or threat of injury may be premised on crime rates, traffic accident rates, dangers of industrial accidents or mishaps, or other similar considerations.

"(c) 'Welfare' shall mean considerations of public convenience, public well-being and general prosperity. The term also properly covers those subjects encompassed under health and safety.

"(2) A proposed facility may be found to substantially impair the health, safety or welfare of the inhabitants if their health, safety or welfare during and after construction would be significantly diminished or weakened relative to present levels."

■ As contrasted with the Rules and Regulations of the Industrial Siting Council, the standard of "no reasonable possibility of serious injury" urged by the appellants ignores the legislative fact that the industrial siting legislation primarily is concerned with the question of acceptability of various impacts. There is no indication that the legislative approach is so strict or absolute that it requires the virtual elimination of all such impacts. The appellants' interpretation further tends to suggest that an applicant for a permit has a higher burden at the initial stage determination than it would have at the second stage determination under § 35–502.87, W.S.1957 (now § 35–12–114, W.S.1977). The ultimate burden of proof imposed upon an applicant does not vary depending upon the stage of the proceedings at which the permit is granted. The only significance of the further intensive study is that it does presuma-

bly lead to a difference in the quantum of information which the Siting Council has concluded is necessary to making a determination of acceptability. In this regard the comments of Professor Van Baalen, in his article, *Industrial Siting Legislation: The Wyoming Industrial Development Information and Siting Act—Advance or Retreat?*, 11 Land & Water L.Rev. 27, 52–57 (1976) are worthy of note.

■ Conversely, the standards suggested by the Rules and Regulations of the Industrial Siting Council do not conflict with the statute under which it was created. We can find no inherent irrationality or unreasonableness in these standards, and consequently, we hold that these standards, not the standard of no reasonable possibility suggested by the appellant, shall govern. It is against these standards then that the record must be evaluated to determine if there is substantial evidence to support the findings of the Industrial Siting Council.

■ The parties do not differ with one another as to the substantial evidence test as previously expressed by this Court. The requirement that the findings of the agency must be supported by substantial evidence is found in the Administrative Procedure Act, § 9–4–114(c)(iv), W.S.1977. In applying this standard for purposes of review we recognize that it may be less than the weight of the evidence, but it cannot clearly be contrary to the overwhelming weight of the evidence. More is required than a mere scintilla of evidence or suspicion of the existence of a fact to be established. In applying these concepts an examination of all of the evidence is necessary, and that examination must lead the reviewing court to the conclusion that there is present such relevant evidence as might lead a reasonable mind to the conclusion manifested in the questioned agency finding. *Board of Trustees, Laramie County School District # 1 v. Spiegel,* Wyo., 549 P.2d 1161 (1976); *J. Ray McDermott & Co. v. Hudson,* Wyo., 348 P.2d 73 (1960); *Rayburne v. Queen,* 78 Wyo. 359, 326 P.2d 1108 (1958); and *Howard v. Lindmier,* 67 Wyo. 78, 214 P.2d 737 (1950). If such substantial evidence is present, it mat-

ters not that the reviewing court might have come to a different conclusion than the one drawn by the agency.

This rule does not result in the evolution of the standard of review urged by the appellant. Instead, judicial review requires a consideration of the evidence in the record to determine whether there is present substantial evidence, under the concepts previously set forth, to support the findings and conclusions of the Industrial Siting Council that the standards promulgated in its rules and regulations have been met in this instance. The standard of review with respect to actions of the Industrial Siting Council is no different than in the instance of any other review of the action of an administrative agency. The legislative adoption of the ordinary standards of administrative review is apparent from the reference to the Administrative Procedure Act found in the Industrial Development Information and Siting Act, particularly § 35–12–115(b), W.S.1977.

The appellants also contend, as a matter of law, that the legislature must have intended that in an instance such as this the additional intensive investigation, study and evaluation contemplated by §§ 35–502.82(e)(iv), 35–502.83, and 35–502.-84, W.S.1957, as amended (now §§ 35–12–109(e)(iv), 35–12–110, and 35–12–111, W.S. 1977) and the second hearing contemplated by §§ 35–502.84(e) and 35–502.87, W.S.1957, as amended (now §§ 35–12–111(e) and 35–12–114, W.S.1977) are required before the granting of a permit. Appellants cite no authority for their proposition, but their argument is that the legislature must have intended that the granting of a permit without these steps, after the initial hearing, must be the exception, and limited to low impact facilities, at the small end of the jurisdictional scale, with no potential for a problem. They insist that the Council acted contrary to law in granting the permit in this instance without these procedural steps. There are several difficulties with this contention. The statute has not been so construed by the Industrial Siting Council and the director and the staff all of

whom are charged with the administration of the Industrial Development Information and Siting Act. Further, the statute is not ambiguous in this regard so as to afford any need for construction. *Demos v. Board of County Commissioners of Natrona County,* Wyo., 571 P.2d 980 (1977). Appellants' argument is contrary to the express language of the statute, and the rule they assert would essentially deprive the Council of its statutory discretion to grant permits under § 35–502.82(e), W.S.1957, as amended (now § 35–12–109, W.S.1977). Furthermore, the legislature suggested no standards to distinguish among applicants under the statute along the lines urged by the appellants in their brief. This contention must be rejected.

There is no question that in this instance the Industrial Siting Council did grant the permit at the end of the initial hearing. Its order provided that the permit to construct the facility "be granted pursuant to W.S. 35–502.82(e)(iii) (now § 35–12–109(e)(iii), W.S.1977)" which reads as follows in terms of the authorized action:

"Approving the application and issuing a permit conditioned upon specific changes in the application; * * * "

The appellants insist, however, that the order is not consistent with that provision because the permit was granted based upon conditions imposed by the Council rather than amendments to the application. While the conditions are not framed as required amendments to the application, it does appear that the Industrial Siting Council and the Basin Electric Power Cooperative assumed that this was the situation. The following dialogue from the record manifests the consent of the applicant:

"Q. (by a Council member) Mr. Grahl, are you aware that in the event the Wyoming Industrial Siting Council issues a siting permit for the Applicant, the Council has the authority to attach conditions to the permit?

"A. Yes. I am.

"Q. Is the Applicant willing to accept a siting permit with conditions attached?

"A. Yes. The Applicant realizes that the Council must assure itself that commitments made by the Applicant so that—will be made by the Applicant so that the proposed facility will comply with the siting act. Throughout this hearing witnesses appearing in behalf of the Applicant will testify to a number of commitments in this regard which the Applicant will certainly honor. The Applicant in any event has no objection to the imposition of reasonable conditions."

While perhaps not technically phrased in accordance with the statutory language, the Council in this instance entered an order approving the application and issuing a permit conditioned upon specified changes in the application.

This conclusion may well dispose of the point of the appellants in this regard which is that conditions for a permit must be the product only of an intensive investigation, study and evaluation of the proposed facility. The summary of their argument, however, reads as follows:

"The permit contains extensive conditions requiring future study, evaluation and investigation and establishing extensive terms, conditions and modifications regarding construction, operation and maintenance of the facility, all for the protection of the environment and the social and economic condition and health, safety and welfare of present and expected inhabitants of the area. These conditions:

"1. Are not specified changes in the application in accordance with Section 82(e)(iii) under which they were issued.

"2. Are prospective requiring investigation, study and evaluation that should be performed in the second stage.

"3. Are a substitute by the Council for the applicant's failure to demonstrate that the proposed facility does not pose a threat of serious injury.

"4. Avoid the basic purpose of the Act which is to have problem areas subjected to an extensive, objective evaluation prior to issuance of a permit and drafting of conditions.

"5. Were not at issue at the initial hearing and as a result, the protestants were denied the opportunity to be heard regarding the conditions which are the foundation of the permit."

■ We do not accept the essential contention by the appellants that such conditions, as amendments to the application, could be only the product of the second stage study. Neither do these conditions constitute a substitute by the Council for the applicant's failure to demonstrate that the proposed facility does not pose a threat of serious injury to the environment nor to the social and economic condition of inhabitants or expected inhabitants of the affected area, and that it will not substantially impair the health, safety, or welfare of the inhabitants. These conditions constitute an effort by the Industrial Siting Council to encompass remedies for contingencies within the application of Basin Electric Power Cooperative which, if the conditions developed, could be relied upon by the Industrial Siting Council in the exercise of its authority and responsibility to monitor the operations, and its authority to revoke or suspend a permit as provided for in §§ 35–502.90 and 35–502.91, W.S.1957, as amended (now §§ 35–12–117 and 35–12–118, W.S.1977). We do not agree that the record supports the contention that these conditions were injected because of a failure by the applicant to establish by evidence its entitlement to a permit.

■ As a part of this argument the appellants claim that they were denied an opportunity to be heard regarding conditions which are a part of the permit. Appellants contend that this was an unconstitutional deprivation of the right of a litigant to notice and an opportunity to be heard. The action of the Council in not conducting a special hearing on the permit amendments does not violate the principles announced in *Fallon v. Wyoming State Board of Medical Examiners*, Wyo., 441 P.2d 322 (1968) and *Glenn v. Board of County Commissioners, Sheridan County*, Wyo., 440 P.2d 1 (1968). The fashioning of an order by the Industrial Siting Council after

the initial hearing is not in and of itself a subject of additional hearing action. If it were the process of preparing and entering an order under the statutory provisions pursuant to which this permit was granted or under other statutory provisions permitting the Council to attach conditions to a permit would be interminable. Consequently, the remedy of protestants, such as these appellants, must be to attack the action on review. They have the burden of demonstrating something more than technical error in this regard, and they have not met that burden in this case.

We turn next to the contention of appellants that error exists in the action of the Industrial Siting Council in granting the permit, but excluding the transmission lines. Appellants' summary of this argument is as follows:

"The Council specifically concluded that the application as pertains to transmission lines was not complete in accordance with the Siting Act and Regulations, and the Council specifically refused to conclude that the transmission lines did not pose a threat of serious injury to the environment or the social or economic condition of the inhabitants. To avoid denying the permit pending further study, the Council issued the permit but excluded the transmission lines, did not authorize construction of the transmission lines and required subsequent additional investigation, study and evaluation. The action of the Council in issuing the permit for the balance of the facility, excluding the transmission lines, was contrary to law because the transmission lines are, as a matter of law, a part of the facility and if the applicant fails to meet its burden with respect to any portion of the facility, the permit must be denied pending further study."

In structuring this argument appellants were quite selective with respect to portions of the record relied upon, and they ignore Section 3.B of the Industrial Siting Permit which reads as follows:

"This permit authorizes the Applicant to construct the entire facility (conditioned on subsequent approval of centerline locations, and construction and operational practices for the transmission lines) as described in the application, and the hearing record, and in accordance with the principle [sic] architectural and engineering criteria and environmental protection commitments set forth therein."

Read together the Findings of Fact and Conclusions of Law demonstrate that the Council in approving the facility considered and included in that approval the transmission lines, but that it did require conditions (amendments to the application) relative to the location of the centerlines of the transmission line corridors.

A dual motivation for this action by the Council can be gleaned from the record. First, since it is impossible to state other than as a plan the final location of the centerlines until the rights-of-way have been acquired, the applicant was not able to furnish that information to the Industrial Siting Council. The expense of furnishing even more precise survey information well might be wasteful until the applicant had some assurance of a generating plant. The Industrial Siting Council approved the permit subject to conditions in these respects in order to accommodate some of the pragmatic difficulties which an applicant for such a facility confronts. In some respects they are quite like that classic conundrum, "Which comes first, the chicken or the egg?" Secondly, the Council desired to maintain control insofar as possible, over the right-of-way location and acquisition functions as a response to expressed landowner concerns.

We can find no statutory barrier to the Industrial Siting Council's treatment of the transmission line problem in the way that it did. Insofar as the Council may have ordered a mode of compliance with its Rules and Regulations somewhat different from the application requirements it may do so in the discretionary exercise of its agency functions. It follows that in this respect the Industrial Siting Council did not act contrary to law.

■ Appellants also complain that the record on appeal is incomplete because it does not include a transcript of a tape recording of a public meeting of the Industrial Siting Council held to discuss the decision of the Council in this case. The question of the right of one of the appellants to obtain the transcript in accordance with the provisions of § 9–692.1, et seq., W.S.1957, as amended (now §§ 9–9–101 through 9–9–105, W.S.1977) was resolved in *Laramie River Conservation Council v. Dinger,* Wyo., 567 P.2d 731 (1977). In the Court's opinion in that case we indicated that such a transcript was a part of the record of the proceedings in a contested case under the provisions of the Administrative Procedure Act, as adopted by the Industrial Information and Siting Act. Technically there is error in the failure to include this transcript as a formal part of the record. The transcript is present in the record, in fact, however, in the form of an attachment to an affidavit of an employee of one of the appellants who represents that the transcript is substantially accurate. Under these circumstances there is no prejudice to the appellants. To the extent that they seek to argue that such a transcript can be relied upon in examining the Findings of Fact and Conclusions of Law of the Industrial Siting Council in the process of judicial review to reach the determinations prescribed by § 9–4–114(c), W.S.1977, we expressly negate such a notion. Such a decisional meeting is designed for the expression of individual views by members of the agency. If they rely upon their experience in lieu of other evidence that may have some record significance. Their official determination as a body, however, is expressed in the formal Findings of Fact and Conclusions of Law, and it is that action only which is to be tested under the law. It cannot be impeached by reliance upon the dialogue of the decisional meeting.

■ The final contentions to be considered are those relating to the adequacy of the record to support the determinations of the Industrial Siting Council. The appellants have the burden of proving that the evidence of the record is insufficient to sustain the agency's decision. *Board of Trustees, Laramie County School Dist. # 1 v. Spiegel,* supra. Recognizing this burden we examine the specific contentions of the appellants with respect to the insufficiency of the evidence. Their arguments, of course, are premised upon the novel, different and more rigorous standard which they proposed, and which we have rejected. The invocation of the special standard of administrative review well might be indicative of a concession that the record would satisfy the correct standard as we have identified it. Nevertheless, we have looked at the several contentions of insufficiency of the evidence in the light of the proper standard, and we are satisfied that in each instance substantial evidence is present to support the challenged action of the agency.

The appellant contends:

"The unrefuted and unrebutted evidence is that the economic condition of agricultural operators will suffer serious injury as the result of the proposed facility, but the Council concluded that there is no threat of serious injury to the economic condition of the present inhabitants. It did so by relying on evidence that the economy as a whole, and those not associated with agriculture, would benefit from the proposed facility. This conclusion is not supported by the evidence and is contrary to the law in that it ignores the fact that the present inhabitants, the agricultural people, will suffer serious injury and is also an unauthorized determination of acceptability of these effects at the first stage."

■ The standard relative to economic conditions has been set forth above. An examination of the factors included makes manifest the proposition that the Industrial Siting Council is to be concerned with the collective not individual welfare of the present and expected inhabitants. The record discloses relevant evidence which a reasonable mind might accept to support the conclusion that the Laramie River Station did not pose a threat of serious injury to the economic condition of present or expected

inhabitants in that the granting of the permit would not result in a significant detriment to or impairment of the economic condition of the inhabitants of the area collectively.

There will be an upgrading of jobs and increased income in the area. Family and per capita income will be increased and unemployment and underemployment rates will be reduced within the area of site influence. The probability is that the purchasing power of earnings within the area of site influence will decrease, and that there will be short-term, but not necessarily long-term, fluctuation of resource consumption and resource availability. There will be some employment dislocation, but skill obsolescence will not result, and there will be increased employment opportunity. There will be increased diversity of the economy and additional stability in various segments of the economy. While it is true that the specific areas of the economy involving those engaged in agricultural operations will suffer detriment in connection with the location of this plant, the conclusion of the Industrial Siting Council must be based upon a balancing of the interests of all the inhabitants of the area, not simply upon the interests of one segment of the inhabitants. In some instances that balancing process might lead to a conclusion favoring the interests of the disadvantaged segment, and in that event the Siting Council would refuse the permit. In this case, however, the evidence as a whole supports on balance the conclusion and the determination of the Industrial Siting Council. The same considerations would apply to the special contentions of the appellants relative to the effect upon the agricultural economy of utilization of water for the operation of the Laramie River Station.

Turning to the contention that the evidence is insufficient to support the determinations of the Industrial Siting Council relative to social condition, the appellants attack basic findings and conclusions as follows:

"207. There is reasonable assurance that a monitoring program can be designed and implemented which is capable of tracking and evaluating socioeconomic impacts, assessing needs, featuring timely implementing contingency measures and evaluating the overall effectiveness of mitigating actions. The elements of such a program include requirements for specific types of data and flow of information to specific decision-making entities. "229b(3). There is reasonable assurance that police and fire protection capabilities and facilities will be adequate. "229b(5). The Applicant's proposals for assuring that capital facility needs are met and adequate operating budgets are available, provide reasonable assurance that the facility will not pose a threat of serious injury by way of reduction of educational capabilities; provided, however, that any shortfalls in budget or facility needs are corrected in a timely manner by the Applicant pursuant to its agreement. "229b(8). The Applicant's proposal for funding mental health and social services, in concert with public sector financing, provide reasonable assurance that the bulk of needs of such services can be met, such that the facility will not pose a threat of serious injury by way of significant deterioration of mental health and social services capabilities."

The appellants specifically claim that the finding that there is reasonable assurance relative to these several factors does not meet the burden imposed by the statute and the regulations. We conclude that the evidence of record does meet the substantial evidence test and leads to the conclusion that there will not be a significant detriment to or impairment of the social condition of present or expected inhabitants. Recognizing that there are intangible qualities surrounding a number of these factors the evidence in this record is adequate to permit a reasonable mind to conclude that the determination of the agency is supported thereby. While appellants attack the determinations of the Council as segments, it must be recognized that all of these conclusions and determinations had to

be consolidated into an ultimate decision to grant the permit applied for, and in this context the requirement by the Industrial Siting Council of any condition resulted in an amendment of the application. This is an appropriate way to resolve certain areas in which absent such a commitment the Board might be concerned as to the potential for injury to the inhabitants, while not justified by the record to order further study or to deny the permit.

The crux of the appellants' contentions in these claims of error is that a further study should have been conducted relative to the social and economic impacts of this proposed facility because the prospective impacts presented to the Siting Council were premised upon population projection figures which were not adequately justified. The key to this puzzle is perhaps well stated in the following question by the Council and the answer by the witness Watts:

"Q. I am going to ask just one question Mr. Watts, and the parties if they object, please indicate.

"Given additional time and given additional money to conduct further studies, do you think that you could be more certain with regard to your population projection figures?

"A. No, I do not."

If the Council was satisfied with the foregoing answer to its question then the futility of a further intensive study is obvious. It is not reasonable to assume that the legislature intended that the Industrial Siting Council was to be foreclosed from issuing permits whether with or without intensive study if the empirical data which might be desired was unknown and could not otherwise be discerned.

We do not understand the appellants to be concerned primarily with the operation of the completed facility so far as the health, safety and welfare, and social and economic impacts are concerned, but to have expressed their concern with respect to the construction phase of the facility. To pursue their argument would require not only a very broad construction of the authority of the Council to attach conditions or modifications to the construction of the facility, but would suggest the obligation of the applicant pursuant to conditions imposed by the Council to control functions of local government which an applicant could not and should not do. Considering examples from impacts referred to in the statute such as transportation, sewer and water facilities, solid waste facilities, police and fire facilities, educational facilities, health and hospital facilities, it would seem unwise to suggest that a permit applicant be in any manner given the authority to carry on governmental functions such as these. Upon analysis it is apparent that the Council pursued the wisest permissible course in requiring the applicant to consent, in effect, to changes in its application pursuant to which it made commitments to assist with these factors. The only other choice for the Council to have made would have been to refuse to grant the permit on the ground that the cumulative effect on the social and economic conditions in the area will substantially impair the health, safety and welfare of the people in accordance with § 35–502.87(b)(iii), W.S.1957, as amended. Even assuming the higher standard of proof urged by the appellants this record would not have justified that conclusion.

The Council has no authority to grant a permit and condition it upon the requirement that the applicant assume the functions, prerogatives or responsibilities of local governmental units. That approach would make a shambles of the constitutional and statutory structure of local government.

Turning then to the claim that there may be an impairment of the health, safety or welfare of the inhabitants, the specific finding and conclusion alluded to by the appellants are as follows:

"218. The health, safety or welfare of present or expected inhabitants of the areas of site influence will not be weakened relative to current conditions.

\*     \*     \*     \*     \*     \*

"230. In accordance with Section 6.c, Rules and Regulations, the facility will

not substantially impair the health, safety and/or welfare of area inhabitants:

"a. The Applicants' proposed alleviation measures and contingency plans are adequate to preclude substantial impairment of the health, safety and welfare of area inhabitants; particularly as alleviation measures are adjusted on the basis of the monitoring program.

"b. The present emergency spillway design for Grayrocks Dam is a minimal design criterion in order to avoid substantial impairment to the safety of downstream property and inhabitants."

In this area also substantial evidence is present in the record to support a determination by the Industrial Siting Council that the health, safety and welfare of the inhabitants during and after construction would not be significantly diminished or weakened relative to the levels present at the time of the application. There would not then result any substantial impairment of health, safety or welfare of the present or proposed inhabitants of the areas of site influence.

Again we note that the test proposed by the appellants is not the proper test, and the correct standard does not require the absence of any impairment. What is "significant" must be a judgment that initially is vested in the Industrial Siting Council, and we should not overturn that determination even though we might have reached a different conclusion.

In the course of their arguments the appellants have presented issues and contentions not specifically discussed above. All have been considered, however, and found to be without merit. In accordance with the foregoing discussion and rejection of the errors asserted by the appellants, the judgment of the district court is affirmed.