In the Matter of the Application for
**CHARTER OF SECURITY BANK,
GILLETTE, Wyoming.**

**STOCKMEN'S BANK AND TRUST COM-
PANY, First National Bank of Gillette,
Wyoming, and First Wyoming Bank of
Gillette, Wyoming, Appellants (Petition-
ers–Protestants),**

v.

**FINANCIAL INSTITUTIONS BOARD,**
State of Wyoming; Karl W. Bergner,
Joseph R. Dunbar, Robert L. Ferril, Joe
W. King, Homer A. Scott, Jr., Lee V.
Stafford, and Joseph H. Watt, organiz-
er–applicants for proposed "Security
Bank of Gillette," Appellees (Respon-
dents).

No. 5292.

Supreme Court of Wyoming.

Sept. 16, 1980.

Thomas D. Roberts, Morgan & Brorby, Gillette, for appellants.

Henry A. Burgess (argued), Burgess & Davis, Sheridan; and John D. Troughton, Atty. Gen.; Peter J. Mulvaney, Deputy Atty. Gen., Civil Division; and Philip Nicholas, Asst. Atty. Gen. (argued), on briefs for appellees.

Before RAPER, C. J., and McCLINTOCK, THOMAS, ROSE and ROONEY, JJ.

RAPER, Chief Justice.

The Financial Institutions Board of the State of Wyoming (Board), after going through all the statutory procedures allowed the application of the organizers and granted, with some conditions attached, a state bank charter for the proposed Security Bank of Gillette, Gillette, Wyoming (Security).[1] The Stockmen's Bank and Trust Company, Gillette, the First National Bank of Gillette, the Wyoming National Bank of Gillette[2] and the First Wyoming Bank of Gillette (Protestants) filed a Petition for Review with the district court. The district court affirmed the Board. The issues raised by Protestants before that court, and now as appellants in this court, were and are:

"1. The Findings of Fact and Conclusions of Law as stated in the Order of the Financial Institutions Board conditionally granting a charter to the Security Bank of Gillette are not supported by substantial evidence.

"2. The Order of the Financial Institutions Board conditionally granting a charter to the Security Bank of Gillette is not in conformity with law."

We will affirm.

The findings and conclusions of the Board supply the background necessary to a disposition of this appeal:

"II.

"FINDINGS OF FACT

"1. That Gillette, Wyoming, is the county seat of Campbell County, Wyoming, and the retail and commercial service center for a large area of northeast Wyoming. Campbell County and Gillette, in particular, have experienced steady growth of population, businesses and industry as they relate to mineral and energy development, and in particular, coal, oil and uranium. Agricultural products including sheep and cattle are also important. Gillette has a present population of approximately 25,000.

"2. That the primary service area of the bank would be the area south of Interstate Highway 90 which highway constitutes a major barrier in the City of Gillette. The other existing banks are all north of Interstate Highway 90. The primary service area has experienced a general and steady growth of population and commercial businesses and this general steady growth should continue in the future.

---

[1] The Board concluded:

"8. That based upon all of the evidence presented at the hearing and based upon the consideration of the record as a whole, including the memorandums or briefs of the parties submitted in support thereof, it is concluded pursuant to the authority vested in the Board by W.S. 13–2–212 (1977), as amended 1979, that the application for charter for the proposed Security Bank of Gillette, Gillette, Wyoming, should be granted subject to the granting of federal deposit insurance by the Federal Deposit Insurance Corporation, subject to the payment of the stated capital in the amount of $1,250,000 and subject to the approval of the Federal Reserve Board as required by law for acquisition by Commerce Bancshares of Wyoming, Inc., Sheridan, Wyoming."

[2] The Wyoming National Bank of Gillette does not join in this appeal.

"3. That the location of the bank and its primary service area south of Interstate Highway 90 would provide easy, ready, available access to the residences and commercial businesses in the primary service area. In general, the Gillette area has experienced a high demand for loans and credit. No banking institution presently exists south of Interstate Highway 90.

"4. That the Gillette economy is growing rapidly with prospects of continued growth.

"5. That the feasibility study submitted by Bickert, Browne, Coddington and Associates, Inc., indicates that Campbell County had experienced a population growth of 152.7% between the 1960 and 1970 censuses and that the population of Campbell County has doubled again since 1970. Employment has been increasing at a 21.7% rate annually and per capita income is approximately $9,096, making Campbell County the highest per capita income county in Wyoming. In addition, natural resources in the county, in particular, coal, oil, gas and uranium, are prevalent.

"6. That the evidence adduced at the hearing indicates that the Security Bank of Gillette, Gillette, Wyoming, is being formed for no other purpose than the legitimate objects contemplated by the laws of the State.

"7. That the proposed capital and surplus of the proposed Security Bank of Gillette, Gillette, Wyoming, is $1,020,000, and that a capital asset ratio of 9.9% would be projected after the third year of operations on such capital.

"8. That total deposits project a capital asset ratio of 9.9% after the third year of operation and that the future earnings projection including gross income estimates and projected operating expenses shows that the proposed bank would experience a net loss at the end of the first year of operation of $60,732; a net loss on the second year of operation in the sum of $10,700; and a net profit at the end of the third year of operation of $75,253 for a cumulative profit of $3,821 at the end of the third year of operation. The projected total deposits of the proposed Security Bank of Gillette, Gillette, Wyoming, are as follows: $3,170,000 at the end of the first year; $6,053,000 at the end of the second year; and $9,230,000 at the end of the third year of operation.

"9. That Commerce Bank Shares, Inc., would be the majority shareholder holding approximately 29,650 shares of the 30,000 shares outstanding and subscribed and would pay $1,008,100 for the shares subscribed. Commerce Bank Shares, Inc., has a present net worth of $6.3 million as of June 30, 1979, and a consolidated earnings of $900,000 annually. The two Wyoming banks owned by Commerce Bank Shares, Inc., have $73 million worth of deposits.

"10. That the proposed Security Bank of Gillette, Gillette, Wyoming, would have a board of directors consisting of seven (7) members, all of whom would be incorporators of the bank; that is, Karl W. Bergner, Joseph R. Dunbar, Robert L. Ferril, Joe W. King, Homer A. Scott, Jr., Lee V. Stafford, and Joseph H. Watt. Each of the proposed directors and incorporators is possessed of a good reputation, ability, financial standing and responsibility in their respective communities and in the State.

"11. That Robert L. Ferril is the proposed chief executive officer and is an experienced banker familiar with the management of a commercial bank.

"12. Terry Sheehan will also be a full-time officer at the proposed Security Bank of Gillette, Gillette, Wyoming, and now is employed by and manages a bank in Colstrip, Montana.

"13. That there are presently four banks in Gillette, namely, the Stockman's Bank and Trust Company, the First National Bank of Gillette, the Wyoming National Bank of Gillette, and the First Wyoming Bank of Gillette. In addition two savings and loan operate in the County of Campbell, namely, First Guaranty Savings and Loan of Gillette and Provident Federal Savings and Loan of Casper.

"14. That the application for authority to organize the proposed Security Bank of Gillette, Gillette, Wyoming, F.I.B. 79–2, was properly completed and filed with the Financial Institutions Board in accordance with W.S. 13–2–201, *et seq.*

"15. That the proposed Security Bank of Gillette, Gillette, Wyoming, has complied with all other applicable provisions of the law regarding application for a bank charter.

"III.

"CONCLUSIONS OF LAW

"1. The public need and convenience of Campbell County and Gillette will be promoted by the establishment of the proposed financial institution.

"2. That conditions in Campbell County and Gillette, Wyoming, afford a reasonable promise of successful operation of the proposed bank.

"3. That the financial institution is being formed for no other purpose than the legitimate objects contemplated by the laws of the State.

"4. That although the proposed capital and surplus are not less than the required statutory minimum that the proposed capital structure of $1,020,000 would not be adequate in light of current and prospective conditions in Gillette, Wyoming, and Campbell County, Wyoming, as adduced by the evidence. However, the Financial Institutions Board concludes that a proposed capital surplus of $1,250,000 would be adequate in light of the current and prospective conditions in the city and county and would afford the proposed bank a reasonable promise of successful operation.

"5. That the proposed officers and directors have sufficient experience, ability and standing in their respective communities and in the State to afford the bank a reasonable promise of successful operation.

"6. That the name of the proposed bank, the Security Bank of Gillette, Gillette, Wyoming, does not so closely resemble the name of any other financial institution transacting business in Campbell County so as to cause confusion between the Security Bank and any other financial institution.

"7. That the applicant has complied with all applicable provisions of law.

"8. * * * [See fn. 1 for text of this conclusion.]"

With respect to the issues, appellants argue:

"1. a. Neither the Financial Institutions Board finding of fact concerning the proposed bank's primary service area nor its finding that Interstate Highway 90 constitutes a major barrier in the City of Gillette are supported by substantial evidence.

"b. Although styled by the Financial Institutions Board as a conclusion of law (conclusion one), the Boards decision that the public need and convenience will be promoted by establishment of the proposed financial institution is in actuality a finding of fact, and is as well unsupported by substantial evidence.

"2. The decision and order of the Financial Institutions Board is not in conformity with law as it was made without the benefit of the required investigation and conclusion on the part of the state examiner as to the effect the proposed bank would have upon existing financial institutions in the community."

The legislature in 1977 created a Financial Institutions Board to hear and approve or disapprove, in accordance with the Administrative Procedure Act, applications for state bank charters.[3] Preliminary investigatory procedures are assigned to the State Examiner.[4]

---

**3.** Chapter 177, Session Laws of Wyoming 1977, now § 13–2–204, et seq., W.S.1977.

**4.** Section 13–2–211, W.S.1977:

"(a) Upon receiving the articles of incorporation, application and other information required, the state examiner shall make a careful investigation and examination of the following:

"(i) The character, reputation, financial standing and ability of the organizers;

The decision of the Board must conform to the criteria established by § 13–2–212(a)(i) through (vii), W.S.1977, amended in 1979 to read:

"(a) Within ninety (90) days after receipt of the transcript of the public hearing, the board shall in its discretion approve, conditionally approve or disapprove the application, but it shall not approve the application until it has ascertained to its satisfaction:

"(i) The public need and convenience will be promoted by the establishment of the proposed financial institution;

"(ii) Conditions in the community in which the proposed financial institution would transact business afford reasonable promise of successful operation;

"(iii) The financial institution is being formed for no other purpose than the legitimate objects contemplated by the laws of the state;

"(iv) The proposed capital and surplus are not less than the required minimum and are adequate in light of current and prospective conditions;

"(v) The proposed officers and directors have sufficient experience, ability and standing to afford reasonable promise of successful operation;

"(vi) The name of the proposed financial institution does not resemble so closely as to cause confusion the name of any other financial institution transacting business in the county; and

"(ii) The character, financial responsibility, banking or savings and loan or other financial experience and business qualifications of those proposed as officers;
"(iii) The character and standing in the community and state of those proposed as directors, stockholders or owners;
"(iv) The need in the community where the institution would be located giving particular consideration to the adequacy of existing financial facilities and the effect that the proposed institution would have upon existing financial institutions in the community;
"(v) The ability of the community to support the proposed institution, including exist-

"(vii) The applicants have complied with all applicable provisions of law.

\*   \*   \*"

■■■■ This court has had experience with appeals involving the granting of bank charters by the State Bank Examiner, prior to creation of the Board of Financial Institutions. Many of the same principles remain unchanged. The agency's decision comes to this court wearing a presumption of legality and validity, and we may not substitute our judgment for that of the administrative body entrusted by the legislature to approve bank charters. *First National Bank of Worland v. Financial Institutions Board of State of Wyoming*, Wyo. 1980, 616 P.2d 787 (1980); *First National Bank of Thermopolis v. Bonham*, Wyo.1977, 559 P.2d 42. The burden is on the appellant to establish that the administrative agency has acted contrary to law. *Wyoming Bancorporation v. Bonham*, Wyo.1974, 527 P.2d 432, 436; *Marathon Oil Co. v. Welch*, Wyo. 1963, 379 P.2d 832; *Whitesides v. Council of City of Cheyenne*, 1957, 78 Wyo. 80, 319 P.2d 520. We cannot lightly disregard the credibility given witnesses by the administrative body. *Snake River Land Co. v. State Board of Control*, Wyo.1977, 560 P.2d 733. The Protestants are aware of and cite precedent of this court, with which we continue to agree, to the effect that when we examine the evidence to determine whether it is substantial enough to support a finding of fact, it must be of such relevancy as a reasonable mind might accept as adequate to support a conclusion. *Laramie River Conservation Council v. Industrial Siting Council*, Wyo. 1978, 588 P.2d 1241; *Shene-*

ing competition, the economic history of the community and the opportunity for profitable employment of financial institution funds; and
"(vi) Such other facts and circumstances bearing on the proposed financial institution as the state examiner may deem relevant.
"(b) The state examiner shall submit his findings verbally and in writing at the public hearing on the application and shall be subject to cross–examination by any interested party. No relevant information shall be excluded by the board as hearsay."

*field v. Sheridan County School District No. 1,* Wyo.1976, 544 P.2d 870. Keeping in mind those principles of review, we shall examine the evidence in order to determine if the evidence adequately supports the action of the Board.

Protestants first challenge the Board's Finding of Fact that the primary service area of the new bank would be the area south of Interstate Highway 90, which highway constitutes a major barrier and all other banks are north of that highway.

Because of a steady and substantial growth developing to the south, residents and commercial businesses need easy access to the bank to be located south of Interstate Highway 90. Our examination of the record shows from the testimony of witnesses, particularly that of Mr. Coddington, Security's expert, that this fact has considerable significance. His testimony is supported by a detailed economic feasibility study prepared for the organizers of the proposed bank which was received in evidence as an exhibit for the consideration of the Board.

A primary service area is defined as that area in which the proposed bank will have a locational or convenience advantage over any other bank. In this instance, the primary service area is set off from the rest of Gillette by physical barriers. Interstate Highway 90, with its limited number of over and underpasses which cut through underneath the Gillette area in an east–west direction, forms a natural dividing line. The Stockmen's and First National banks are 1.7 and 1.8 miles respectively away from the Security's location. Douglas Highway running north–south through Gillette carries extremely heavy traffic–about 20,000 vehicles per day–in the vicinity of the bank. It appears that ongoing commercial development extends south on Douglas Highway. The 4–J Road leaves Gillette on the south heading southwesterly toward Midwest near which is extensive residential development. The Douglas Highway and the 4–J Road are linked by Cut Across Road, a four–lane highway.

At the time of the hearing, according to Coddington's testimony, the population in the service area was about 3,300 with 1,100 households; and estimated that at the end of the third year of the new bank, there would be about 2,800 households representing about 8,100 people–more than doubling in that period. This estimate comes from a study of housing development which, according to the developers, 2,600 new residential units would be built, discounted for conservative reasons to 1,650 units. The per household annual income in the service area was estimated to be about $29,000, the highest ever encountered in the many feasibility studies he has made. A survey of businesses in the area revealed an estimated 1,600 full–time employees.

There are commercial–type establishments within the area, such as the Holiday Plaza Center, within a block of the proposed bank location, representing 60,000 square feet anchored by a grocery supermarket. Across the road is Powder Basin Mall under construction with one store occupying 33,000 square feet, with an additional 250,000 square feet of retail space. Safeway or Albertsons is planned for that location, a quarter to one–half mile south of the bank location. Another 250,000 square foot shopping center called the Homestead Mall will abut the Basin Mall site. Mr. Coddington was unaware of any 500,000 square foot shopping center in the Rocky Mountain region that did not have a bank in or adjacent to it.

Just north of the bank location is a 39,000 square foot office building, with another of the same size planned. Extending south on Douglas Highway are industrial firms primarily wholesale, oil field supply, industrial supply, building supply type businesses, all potential bank customers.

The upshot of Coddington's report and testimony pointed to a definite convenience advantage in the primary service area over the other banks in the community all of which are located north of Highway 90, thereby justifying another bank with that location.

Further, it was the opinion of Mr. Coddington that the new bank would not damage the existing banks because, in his extensive experience, existing banks will continue to grow. When $1,000,000 in new capital is injected into a community, the total banking market expands because of the bank's ability to in effect create deposits by loaning out money. It is not like dividing up an existing pie. It was not expected that the new bank would capture 100% of the market within its primary service area but over a three–year period would gather in about 35%.

█ While there was testimony in conflict with that of Mr. Coddington, none was supported by the extensive detail provided by him and Mr. Ogier who made the profitability study. The conflict, for the most part, dealt with generalities. It is understandable that the Board would be convinced as it was. While we might disagree with the conclusion, and there may be room for a different finding, that is not the measure. It is our holding that a reasonable mind would support the conclusion of the Board as to the primary service area of the new bank.

The preceding discussion of evidence before the Board also supports the Board's conclusion that the public need and convenience will be promoted by establishment of the proposed bank. Appellants then contend that Conclusion of Law numbered "1." should be styled a finding of fact and is unsupported by substantial evidence. We disagree. It is a mixed finding of fact and conclusion of law. It is an ultimate finding of fact based on the Board's detailed Findings of Fact Nos. 1, 2, 3, 4, and 5 pointing to the growth of Gillette and its environs creating a need and convenience for those in

the primary service area and the total area of Campbell County as well. The entire Gillette community has grown by leaps and bounds and the energy demand forecasts massive future growth. The projections of a steady growth of deposits, and at the end of three years a showing of profit (Finding No. 8), points to need. It is a conclusion of law in that it is a decision which must be made by the Board as one of the criteria required by § 13–2–212, W.S.1977, 1979 Cum.Supp. An appellate court will regard a finding or conclusion for what it is, regardless of the appellation put on it by a trial court or administrative body. It is not always easy to decide what is a finding of fact or conclusion of law. In any event, we view it in both lights in this opinion. There must be substantial evidence to support public need and convenience, and we hold there was.

The final question argued by the Protestants is that the Board did not have the benefit of a decisive recommendation from the State Examiner as to the effect the bank would have upon existing financial institutions in the community. An examiner from the office of the State Examiner made the investigation and examination required by § 13–2–211, W.S.1977 (fn. 4), and pursuant to subsection (b) of that statute submitted the findings in writing and testified as to his findings verbally at the hearing now on review. All findings were noted as favorable except as to item (iv) covering community need, adequacy of existing financial institutions and effect the new bank would have upon existing financial institutions in the community. The written report under the examiner's comments as to that item concluded[5] that "[s]ince there is a

---

**5.** The following appeared preceding the examiner's conclusion:

"Interviews were conducted with management of the various banks and savings and loans as well as some business firms and residents in the service or trade area in order to learn more about the local financial institutions that serve the Gillette community. With the exceptions of the financial institutions, the interviews were conducted on a random selected basis. Among the business

firms and residents interviewed, many expressed a degree of satisfaction with the service of the existing financial institutions. A number of the people indicated an interest in the new bank charter and desired to place a first, second or third account with the bank if the charter were granted. Many were satisfied with their bank and wondered what additional services could be available to the public over and above those services already offered by the existing banks. Some indi-

number of issues involved in rendering an evaluation either favorably or unfavorably, an indecision prompts a marginal conclusion." During the course of cross–examination of the assigned investigator there was the following exchange:

"Q. Now, I didn't see anything in your report which addressed the needs of the community. I didn't see anything in your report which addressed the adequacy of the existing financial facilities. I didn't see anything in your report which addressed the effect the proposed institution would have upon existing financial institutions in the community. Have I missed something?

"A. That we covered under the convenience and needs factor of the investigation.

"Q. Could you point that out?

"A. That would be your Section V on down.

"Q. Under what?

"A. Keep going down, Wade. One more–the next two. That page and the next page.

"Q. Well, as I understand the law, it makes it mandatory for you to make a careful investigation and examination of the effect the proposed institution would have upon existing financial institutions. I don't see where you have said anything about that.

"A. That's right. I have hedged my comment in there.

"Q. Can you tell me where you addressed that comment on the effect to existing institutions?

"A. That is not in the written comments.

"Q. Have you addressed in your written comments the adequacy of existing institutions?

"A. Well, if they were inadequate, I would address it.

"Q. So, you are saying they are adequate?

"A. Yes.

"Q. And you have hedged your comments in the needs aspect?

"A. Convenience and need factor, that's right."

At that point counsel for the appellants moved for a continuance in order to give the State Examiner time to make a careful examination of the effect the proposed institution would have upon existing financial institutions and report his findings as required by § 13–2–211(a)(iv), W.S.1977. After argument between counsel, it was made clear that the required investigation had in fact been made and the report was before the Board for its consideration, whereupon the motion was overruled.

Cross–examination was continued, and it was developed that in all instances in Wyoming, where new banks were chartered and opened, there was no effect upon older banks, and all new banks more than met their projections.

Though the motion had been denied once, counsel for the appellants persisted in interrogating the examiner's investigator, endeavoring to force an answer that the elements of § 13–2–211(a)(iv), W.S.1977 were either favorable or unfavorable for the establishment of a new bank. Repeatedly the investigator testified that he had come to no conclusion and, in effect if a conclusion was necessary, it was that he did not know. The hearing officer once again denied the motion for continuance and ruled that the investigator was not required to report fa-

cated more competition would be welcome. Others stated the proposed location would offer more convenience as well as provide an alternate banking facility.

"Management in the local banks expressed oral objections to the new bank charter being granted. All believed their bank was currently serving the needs of the community and that the proposed new bank location would not provide a greater degree of convenience than is already being provided by the existing banks. Each indicated that much of their deposit growth has been inflationary growth along with public funds in the last few years. Management was less than optimistic for the new proposed bank charter in view of the growth rate of the First Wyoming Bank–Gillette which has only been operational about seven months. Each felt it would be prudent to allow this new bank an opportunity to demonstrate its convenience and needs to the Gillette community."

vorably or unfavorably but only state his findings (fn. 5, this opinion) which were inconclusive.

Appellants argue that since § 13–2–211(a)(iv) provides that the State Examiner "shall" make a careful examination of, among other items, "the effect that the proposed institution would have upon existing financial institutions in the community" there is a mandatory requirement for public officials to conform, citing *Pelzer v. City of Bellevue*, 1977, 198 Neb. 19, 251 N.W.2d 662, reversed on other grounds, 1978, 200 Neb. 541, 264 N.W.2d 653. The point apparently made is that since the investigator was forced to "hedge" his comments there was no careful examination; and, therefore, noncompliance with the law and the failure of the Board to deal with the noncompliance is ground for reversal of the Board's order [6] granting a charter.

■ As we view § 13–2–211, it provides an independent source of information as an aid to the Board. The State Examiner's role is to find facts for the Board and report results. The position of appellants appears to be that the State Examiner must make a recommendation or come to a conclusion of favorability or unfavorability as to each of the several particular items the State Examiner is required to inquire into and that inconclusive findings are prohibited. We see no language in § 13–2–211

which requires the State Examiner to make definite recommendations or arrive at definite conclusions.

A finding follows the ascertainment of facts and denotes the result of an investigation. *Martin v. Wayne County Civil Service Commission*, 1969, 16 Mich.App. 536, 168 N.W.2d 419, 421; *Maeder Steel Products Co. v. Zanello*, 1923, 109 Ore. 562, 220 P. 155, 158. A failure to find material facts is a finding. *Wabash Valley Coach Co. v. Turner*, 1943, 221 Ind. 52, 46 N.E.2d 212, 215. Circuit Judge Learned Hand in *Commercial Molasses Corp. v. New York Tank Barge Corporation*, 1940, 114 F.2d 248, 250:

"The finding that the 'cause of the accident has been left in doubt' means, we take it, that the evidence as to whether or not the barge sank because of unseaworthiness, was so evenly matched that the judge could come to no conclusion upon the issue. Though negative in form, it was as much a 'finding' as an affirmative finding, and we are to respect it as such. * * * "

We hold that § 13–2–211, W.S.1977 only calls upon the State Examiner to investigate and report facts and results with respect to items (i) through (vi) of § 13–2–211(a); that, he did in this case.

The final decision–making function is left to the Board under the statutory criteria established by § 13–2–212, W.S.1977, 1979

6. Section 13–2–214, W.S.1977 provides:

"Any decision of the board in approving or disapproving any charter or the issuance or denial of a certificate of authority is appealable to the district court of the county in which the institution is to be located in accordance with the provisions of the Wyoming Administrative Procedure Act [§§ 9–4–101 to 9–4–115]. In addition to the grounds for appeal contained in the Wyoming Administrative Procedure Act, the appellant may appeal if the board or the state examiner fails to make any of the findings required."

Section 9–4–114(c), W.S.1977, 1979 Cum. Supp., of the Wyoming Administrative Procedure Act now provides:

"(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.

In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

"(i) Compel agency action unlawfully withheld or unreasonably delayed; and

"(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

"(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

"(B) Contrary to constitutional right, power, privilege or immunity;

"(C) In excess of statutory jurisdiction, authority or limitations, or lacking statutory right;

"(D) Without observance of procedure required by law; or

"(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute."

Cum.Supp. Item (iv) of § 13–2–211(a) is related to § 13–2–212(a)(i) which requires the Board to ascertain to its satisfaction that "[t]he public need and convenience will be promoted by the establishment of the proposed financial institution[.]" The State Examiner is not the sole source of information and evidence upon which the Board acts. If there is other substantial evidence before the Board which persuades it to a conclusion the public need and convenience will be met, then the expression of the investigating bank examiner in his report that "an indecision prompts a marginal conclusion" is overcome.

Affirmed.

